## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD W. DAVIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2:08-406-MBC** |
| | ) |
| **AK STEEL CORPORATION and AK** | ) |
| **STEEL CORPORATION BENEFIT** | ) |
| **PLANS ADMINISTRATIVE COMMITTEE** | ) |
| | ) |
| **Defendants.** | ) |

### Opinion

Plaintiff Richard W. Davis commenced this action seeking Long Term Disability Payments pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), against his former employer, AK Steel Corporation, and the Long Term Disability Plan Administrator, AK Steel Corporation Benefit Plans Administrative Committee. Mr. Davis asserts that he is eligible for Long Term Disability benefits under the Plan, but that Defendants failed to provide him with a summary plan description of the relevant Long Term Disability Plan, failed to inform him of the time limits for applying for benefits, and failed to affirmatively assist Mr. Davis in applying for benefits when they knew he was eligible.

Defendants' have filed a motion for summary judgment arguing that they did not breach their fiduciary duty, that they properly distributed benefit information to Mr. Davis, and that they were under no affirmative duty to seek out Mr. Davis to inform him of the eligibility requirements for benefits. For the reasons discussed below, we will grant Defendants' motion and dismiss this action.

**I. Background**

The relevant facts of this case are as follows. Plaintiff Richard Davis was hired by Defendant AK Steel Corporation's predecessor, Armco Inc., as an hourly employee at the company's Butler Works Branch in May, 1991. Mr. Davis began his employment on May 8, 1991, with a three-day orientation. (Letter from Cindy Rodrico to Richard Davis, May 2, 1991, Def. Ex. 3.) At the orientation, new employees were given the "Benefits Work Book" which included a full description of the Long Term Disability plan, including all of the relevant eligibility requirements. (Affidavit of Patricia Cassidy, October 20, 2008, at ¶ 4, Def. Ex. 4.) Mr. Davis enrolled in company benefits for his family during his orientation. (Deposition of Richard Davis, at 7.)

AK Steel offered its employees a benefit program that included pension, health care, life insurance, non-occupational accident and sickness, and long term disability. These benefits were collectively bargained with the Butler Armco Independent Union, which is now the United Auto Workers Local 3303. The benefits programs were set forth in summary plan description booklets. The 1990 Long Term Disability plan was described in a summary plan booklet entitled "Benefits Workbook, Butler Hourly Comprehensive Health Program." (Def. Ex. 12) Following collective bargaining with the Union in 1994, 1997, and 2002, new summary plan booklets were issued covering all of the company's benefit programs. These booklets were entitled "Insurance Benefit Plans II for Hourly Paid Employees of AK Steel Corporation, Butler Works." (Def. Ex. 6 (1994), Def. Ex. 7 (1997), and Def. Ex. 8 (2002).)

The Long Term Disability program as described in each of the summary plan descriptions provided income to eligible employees who experienced a totally disabling injury or disease as determined by a physician approved by the Long Term Disability Plan

2

Administrator. (Def. Ex. 12, at LT 1 – LT 8; Def. Ex. 6, at 3, 75-79; Def. Ex. 7, at 4, 76-80;

and 2002 Def. Ex. 8, at 3, 61-64.) The 1990, 1994, 1997, and 2002 summary plan

descriptions each described the eligibility requirements for Long Term Disability as follows:

> You are eligible to apply for LTD benefits if you meet all of the following
> conditions:
>
> • You had completed two (2) years of continuous service before
> becoming disabled and you were actively at work, or otherwise a
> qualified participant under the Plan, when the disability commenced.
>
> • You have been off work due to disability for an uninterrupted period
> of twelve (12) months, and your continuous service has not been
> broken. Successive periods of disability separated by a period of active
> continuous employment of less than 60 days will be considered one
> uninterrupted period in satisfying the twelve (12) month requirement.
>
> • You are totally and permanently disabled as certified by a physician
> approved by the Benefit Plans Administrative Committee.
>
> • You are entitled to Social Security disability benefits, and such
> entitlement is for a month not later than the first month following
> termination of your continuous service.

(1990 Benefits Workbook, Def. Ex. 12, at LT 2; see also nearly identical language in the 1994

plan description, Def. Ex. 6, at ¶ 7.2; the 1997 plan description Def. Ex. 7, at ¶ 7.2; and the

2002 plan description, Def. Ex. 8, at ¶ 7.2.) Thus, with the exception that the 1990 eligibility

requirements also included an age requirement that applicants must be less than age 62, the

relevant eligibility requirements for Long Term Disability have not changed since Mr. Davis

was hired in 1991.

While representing Mr. Davis in a divorce proceeding during a time when Mr. Davis

was off work due to health reasons, his attorney asked Mr. Davis to obtain information from

the Benefits Department as follows:

3

1. . . . a letter stating what you qualify for in terms of disability benefits. Specifically, do you qualify for the long term disability program, and if not, the reason you do not.

4. . . . a letter statement regarding your right to reinstatement to employment upon release by your physician. Specifically, what are the applicable rules in regard to your right to return to work, and is there a period of time, after which you lose your employment status?

(Letter from Norman D. Jaffe to Richard Davis, June 25, 1993, attached as Ex. A to

Def. Ex. 15.)

Karen Fitzpatrick, a Benefits Department employee, noted in handwriting on Mr.

Davis' attorney's June 25, 1993 letter: "needs plse call when ready", along with Mr. Davis'

telephone number. (Id.; Cassidy Affidavit, at ¶ 8, Def. Ex. 4.) The Benefits Coordinator at

the time, Patricia Cassidy, responded to the inquiries by letter as follows:

Per your request, please note answers to your two questions directed to the Benefits Office:

1. Attached is the language regarding the Long Term Disability Plan, which was taken from the Hourly Benefits Workbook. Please notice that I have highlighted the page that lists the conditions for eligibility (Page LT 2).

4. An Employee's Continuous Service will be broken by an absence which continues for more than two years.

We hope this information is helpful to you.

(Letter from Patricia Cassidy to Richard Davis, July 12, 1993, attached as Ex. B to Def. Ex.

15.) Ms. Cassidy included pages LT 1 and LT 2 of the 1990 Benefits Workbook. (Id.) Page

LT 2 of the 1990 benefits booklet set forth in relevant part the eligibility requirements as set

forth above. (1990 Benefits Workbook, Def. Ex. 12, at LT 2.)

When a new summary plan description became effective in 1994, 1997, and 2002, the

benefits booklet was distributed to the employees by the Benefit Department acting for the

plan administrator as follows. Booklets were provided to each department at the Butler Works for each employee. (Cassidy Affidavit, at ¶ 4; Deposition of Karen Fitzpatrick, at 32, Def. Ex. 33; Deposition of Rick Winter, at 30-31, Def. Ex. 17.)

Upon receiving a benefits booklet, each employee's name would be checked off on a list, and the list would eventually be returned to the Benefits Department. (Cassidy Affidavit, at ¶ 4; Fitzpatrick Dep., at 32-33.) If an employee's name was not checked off, the Benefits Department would arrange for the employee to receive the booklet. (Cassidy Affidavit, at ¶ 4.)

In April 1999, Mr. Davis suffered a seizure while in an automobile, and it was discovered that he fractured his spine. (Deposition of Richard Davis, at 36.) As a result, he was off work for two years, from April 11, 1999 until April 10, 2001. (Id. At 36-37.) In April 2000, the Social Security Administration determined that Mr. Davis was disabled for Social Security purposes as of May, 1999. (Notice of Award, April 13, 2000, Pl. Ex. J.) Mr. Davis also received Sickness and Accident Benefits from the company during the first year he was off work. (Davis Dep. at 9-10.)

Mr. Davis returned to work in a new position as a watchman on April 10, 2001. (Id. at 36.) Prior to returning to work, he met with the Dr. Lorna Abbot, the physician who monitored employees for Defendants. (Deposition of Lorna Abbott, M.D., at 98.) He stayed in the watchman position until January 18, 2002, when he was taken off work because "[h]is back pain was increasing [and] he couldn't take riding in the truck because of the increase in his back pain." (Abbott Dep., at 99-101; Narrative of Vincent J. Silvaggio, M.D., January 10, 2009, Pl. Ex. H.) Mr. Davis once again received Sickness and Accident Benefits and continued to receive Social Security Disability Income. (Complaint, ¶ 13.)

5

On January 15, 2004, AK Steel sent Mr. Davis a letter informing him that his

continuous service would be broken on January 19, 2004. (Letter from Rick Winter to

Richard Davis, January 15, 2004, Pl. Ex. N.) The letter stated in part as follows:

> This letter confirms that your continuous service with AK Steel will be broken
> as of January 19, 2004, which is two years from your last day worked (January
> 18, 2002).
>
> I wanted to advise you that as a result of a break in service, effective January
> 19, 2004, you will cease to have coverage for all active employee benefits
> contained within the Insurance Benefits Plan. In addition, effective January 19,
> 2004, you will cease to accrue additional continuous service for pension
> purposes. You will have eligibility for a deferred vested pension which you can
> elect at age 65. If you choose, you may elect to take a reduced pension once
> you become age 55.
>
> You will have seniority rights under the Basic Labor Agreement which will
> continue for an additional three years. This is important in the event your
> doctor releases you for work.

(Id.)

In August 2007, Mr. Davis informed AK Steel's Employee Benefits Office in writing

that he wished to apply for Long Term Disability benefits. (Letter from Richard Davis to AK

Steel Benefits Department, Pl. Ex. N.) The letter stated as follows:

> I wish to apply for long term disability benefits. I was not properly informed of
> my entitlement to this benefit. I have enclosed two complete forms because I
> am not sure of my break in service date.

(Id.) Cindy Graham contacted Mr. Davis and told him that he was not eligible to apply for

Long Term Disability since his service had broken more than three years before. (Graham

Dep. At 51, Def. Ex. 53.)

Dr. Silvaggio released Mr. Davis for work with restrictions on March 16, 2007,

although he later stated that he did so even though he "was of the opinion that [Mr. Davis]

6

was totally disabled." (Office Note of Dr. Silvaggio, March 16, 2007, Def. Ex. 49; Silvaggio

Narrative, Pl. Ex. H.)

On March 24, 2008, Mr. Davis filed a complaint against AK Steel Corporation, and

AK Steel Corporation Benefit Plans Administrative Committee.  Mr. Davis's Complaint

alleges:

1. That "Mr. Davis is eligible for LTD benefits under Insurance Benefits Plan II,
   but Defendants failed to permit him to apply for benefits in violation of the
   provisions of ERISA § 503, 29 U.S.C. § 1133, and . . . 29 C.F.R. 2560.503-1."
   (Compl., ¶ 25.)

2. That "AK Steel and the Committee failed to establish or follow claims
   procedures that would yield a decision on the merits of Mr. Davis's claim for
   LTD benefits," in violation of ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R.
   2560.503-1.  (Compl., ¶ 26.)

3. That "Defendants breached their fiduciary duties set forth in ERISA § 404, 29
   U.S.C. §1104, in failing to act solely in the interest [of] Mr. Davis, an
   Insurance Benefits Plan II participant, for the exclusive purpose of providing
   benefits to Mr. Davis, and in accordance with Insurance Benefits Plan II, and
   breached not only their negative duty not to misrepresent material facts to plan
   beneficiaries, but also the corresponding affirmative duty to speak "when the
   trustee knows that silence might be harmful."  (Compl., ¶ 21.)

The Complaint requests relief pursuant to remedies available under ERISA § 502(a), 29

U.S.C. § 1132(a).  Specifically, Mr. Davis requests a declaration that Defendants breached

their duties, an Order that Defendants pay past and future LTD benefits, an Order that

Defendants pay the costs of the lawsuit, and any other award of relief that the court deems just

and proper.

## II. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Summary judgment may be granted only if the moving party establishes that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. Summary judgment is appropriate only when the record evidence could not lead a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-249 (1986). In evaluating a motion for summary judgment the court does not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). Rather than evaluating the evidence and determining the truth of the matter, the court determines whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. Reeves, 120 S.Ct. at 1210; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III. Standard of Review of ERISA Administrative Decision

Mr. Davis contends that this court is required to conduct a *de novo* review of Mr. Davis's Long Term Disability benefits claim. (Plaintiff's Memorandum in Opposition to Defendants' Motion, at 8.) Defendants do not disagree. (Defendants' Reply Memorandum, at 2.) We agree that the standard of review in this case is *de novo* since discretionary authority was not used.

In Gritzer v. CBS, Inc., the court ruled that since discretion was not actually exercised by the plan administrator, *de novo* review was proper. 275 F.3d 291, 295 (3d Cir. 2002). It is clear that discretion was not used in the case before us. When Mr. Davis applied for LTD benefits in August 2007, his service had been broken over three years before on January 19, 2004. (Compl., at ¶¶ 17, 19.) Since Defendants merely had to refer to the specific date that

8

Mr. Davis' service broke, they were not required to use any discretionary authority in determining that he was not eligible to apply for LTD benefits. Since Defendants did not use discretionary authority in determining whether or not to deny Mr. Davis's claim, the Court reviews this case *de novo*.

## IV. Discussion

Mr. Davis alleges that he is eligible for Long Term Disability benefits, but that Defendants violated ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R. 2560.503-1, by failing to establish and follow claims procedures, and by failing to permit Mr. Davis to apply for benefits. (Compl., ¶¶ 25-26.) Mr. Davis alleges that specific failures by Defendants to follow procedures or to permit his application to be processed prevented him from being able to pursue a decision on the merits of his Long Term Disability claim. Specifically, he contends that Defendants failed to timely and properly distribute a summary plan description to him, failed to notify him that he had to apply for Long Term Disability benefits before his break in service, and failed to permit him to apply for Long Term Disability benefits after his continuous service broke.

Defendants seek judgment as a matter of law arguing that there is no genuine issue of material fact, that Defendants complied with ERISA and did not breach any duty it owed to Mr. Davis. Viewing the facts in a light most favorable to Mr. Davis we find that no genuine issue of material fact remains.

### A. Timeliness & Manner of Distribution of Summary Plan Descriptions

Mr. Davis' primary contention is that he never received the 2002 Insurance Benefit Plans II for Hourly Paid Employees of AK Steel that would have reasonably apprised him of an obligation to file his claim for Long Term Disability benefits before his break in service.

(Plaintiff's Memorandum in Opposition to Defendants' Motion, at 12.) He claims that under ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1), the plan administrator must furnish a Summary Plan Description no later than 210 days after the end of the plan year in which the plan is adopted. (Plaintiff's Memorandum in Opposition to Defendants' Motion, at 12-13.) Mr. Davis says that because the 2002 Summary Plan Description covering all of the company's benefit programs was not provided to him within 210 days after the 2002 amendments, Defendants violated this ERISA provision.

While Mr. Davis' focus throughout his brief is on the alleged failure of Defendants to provide him with the *2002* summary plan description, the relevant law dictates that we must consider Defendants' efforts to provide Mr. Davis with a description of benefits throughout his employment. Contrary to Mr. Davis' assertion, it is not irrelevant whether Defendants complied with the applicable law in distributing benefit descriptions in 1994 and 1997.

Section 1024(b)(1), which sets forth the requirements regarding publication of the summary plan description to plan participants requires that the "administrator shall furnish to each participant, . . . , a copy of the summary plan description, and all modifications and changes referred to in section 1022(a)(1) of this title— **(A)** within 90 days after he becomes a participant, . . . ." 29 U.S.C. § 1024(b)(1). This section refers to distribution of the summary plan description when a participant first becomes a participant in the plan, which for Mr. Davis, was on May 8, 1991. Mr. Davis began his employment with a three-day orientation. At the orientation, new employees were given the "Benefits Work Book" which included a full description of the Long Term Disability benefit, including all of the relevant eligibility requirements. In addition, Mr. Davis enrolled in company benefits for his family during his orientation.

While Mr. Davis testified that he "imagined" he received benefits information at the

new employee orientation but could not remember actually receiving it, Mr. Davis does not

contend that Defendants failed to provide him with a summary plan description within 90

days of becoming a participant in the benefits plan. (Davis Dep., at 7.) Thus, Defendants

fulfilled their duty to provide Mr. Davis with a summary plan description within 90 days after

he became a participant.

When plan amendments have been made, the administrator must furnish an updated

summary plan description every five years as follows:

> The administrator shall furnish to each participant, . . . , every fifth year after
> the plan becomes subject to this part an updated summary plan description
> described in section 1022 of this title which integrates all plan amendments
> made within such five-year period, except that in a case where no amendments
> have been made to a plan during such five-year period this sentence shall not
> apply.

29 U.S.C. § 1024(b)(1).

Even when no amendments have been made to a plan within five years, section

1024(b)(1) still requires that the "administrator shall furnish to each participant, . . . , the

summary plan description described in section 1022 of this title every tenth year after the plan

becomes subject to this part." 29 U.S.C. § 1024(b)(1).

Finally, section 1024(b)(1) provides a narrower time frame for distribution of

summary plan descriptions when there has been a modification or change in the information

contained in the summary plan description as set forth in 29 U.S.C. § 1022(b). When the

modification or change is a material reduction in covered services or benefits provided under

a group health plan, then "a summary description of such modification or change shall be

furnished to participants and beneficiaries not later than 60 days after the date of the adoption

11

of the modification or change." 29 U.S.C. § 1024(b)(1). When the modification or change is something other than a material reduction in covered services or benefits, then "a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted." 29 U.S.C. § 1024(b)(1).

The company's Benefits Package was amended in 1994. At this time, the eligibility requirements for long term disability were changed to permit participants under the age of 62 to apply for benefits. This is the only modification or change to the Long Term Disability plan throughout the relevant time period of this lawsuit. Otherwise, the eligibility benefits for long term disability remained the same as when the plan was introduced in 1990. The company's Benefits Package was amended again in 1997 and 2002, but as stated, the Long Term Disability plan was not changed or modified in these years.

The regulations interpreting the furnishing of summary plan descriptions require that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants." 29 C.F.R. 2520.104b-1(b)(1). The regulations go on to explain as follows:

> [Summary plan descriptions] must be sent by a method or methods of delivery likely to result in full distribution. For example, in-hand delivery to an employee at his or her worksite is acceptable. However, in no case is it acceptable merely to place copies of the material in a location frequented by participants.

Id. This does not mean that the administrator must prove that a participant actually received the summary plan description; instead, the administrator must establish that the method of distribution was "reasonably calculated" to reach participants. Communication Workers of America v. Comcast Cable Communications, Inc., 2008 WL 696925, at *2 (W.D. Pa. Mar. 12 2008).

Mr. Davis does not remember if he received a benefits booklet in 1994, 1997, and 2002. Mr. Davis states that he does not recall if he received the 1994 booklet, but that if he did he probably threw it out. (Plaintiff's Response to Defendants' Statement of Material Facts, at 23 (we note that Mr. Davis' deposition testimony in support of this averment does not refer to the 1994 booklet, see Davis Dep., at 19-20).) With regard to the 1997 summary plan description, Mr. Davis testified that he does not recall if he received this booklet, and if he did receive it he probably threw it out. (Davis Dep., at 18-20.) With regard to the 2002 summary plan description, when asked whether he received the 2002 booklet on January 7, 2003 as indicated on an employee list, Mr. Davis testified "I can't remember." (Davis Dep., at 63-64.)

Mr. Davis' testimony that he could not remember receiving a benefits booklet in 1994, 1997, or 2002, but admitting that it was possible that he did does not raise a genuine issue of material fact. Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1301-02 (3d Cir. 1993). In any event, the relevant issue is not whether Mr. Davis actually received a summary plan description, but whether Defendants' procedures were "reasonably calculated" to ensure that participants received it, using a method of delivery "likely to result in full distribution." 29 C.F.R. 2520.104b-1(b)(1). We find that Defendants' method of delivery here was reasonably calculated to ensure that the recipients received it and that the method used was likely to result in full distribution to the recipients.

The method of distribution of the summary plan descriptions was the same in 1994, 1997, and 2002. Defendants provided enough copies of the summary plan description for each employee in each department at the Butler Works. (Cassidy Affidavit, at ¶ 4; Deposition of Karen Fitzpatrick, at 32, Def. Ex. 33; Deposition of Rick Winter, at 30-31, Def. Ex. 17.)

13

Upon receiving a benefits booklet, each employee's name would be checked off on a list, and

the list would be returned to the Benefits Department. (Cassidy Affidavit, at ¶ 4; Fitzpatrick

Dep., at 32-33.) If an employee's name was not checked off, the Benefits Department would

arrange for the employee to receive the booklet in some other manner. (Cassidy Affidavit, at

¶ 4.)   Specifically, Patricia Cassidy, AK Steel's Benefits Coordinator until January 31, 1999,

explained the method of distribution for the 1994 and 1997 summary plan descriptions as

follows:

> The Employee Benefits Department distributed information about the
> company's employee benefit program, including Long Term Disability
> ("LTD") benefits. A full description of the LTD benefit, including all of its
> eligibility requirements, was contained in the "Benefits Work Book" from
> 1990 to 1993 and the Insurance Benefits Plan II booklets effective January 1,
> 1994 and January 1, 1997. These benefit booklets were distributed at each new
> hire's orientation and were given to each employee in his or her department
> shortly after a new benefit booklet was published. Department supervision was
> required to verify that each employee was given a benefits booklet by checking
> the employee's name off of a checklist. Arrangements were made for
> employees to receive a benefit booklet if, for some reason, their name was not
> checked off on the checklist due to absence.

(Cassidy Affidavit, at ¶ 4.)

Karen Fitzpatrick, the current Employee Benefits supervisor, described distribution of

the 2002 summary plan description as follows:

> [W]e sent a letter, cover letter to all managers in the area with a list of all their
> people in that area and saying that everyone had to be given this booklet, and
> they needed to sign off when they were received and then give it back to us
> when they were done.

(Deposition of Karen Fitzpatrick, at 32.) Ms. Fitzpatrick further testified that her department

took the list of personnel in each department, "put a cover sheet on it, attached all the booklets

for each person", and sent that packet "to the supervisors to distribute." (Fitzpatrick Dep., at

33.) We find Defendants' procedure to be sufficient under ERISA.

14

Defendants have provided a copy of the letter of instructions given to the Supervisor of the Labor Department by the Benefits Department, along with the attached list of employees in the department. (Def. Ex. 34.) Mr. Davis' name is on the list. The employee designated as the person to distribute the 2002 booklets in the Labor Department was Marge Mincer. (Deposition of Cindy Graham, at 59.) The letter indicates that after each employee has been given a copy of the booklet, and the receipt so indicated on the list, the list is to be returned to the Benefits Department by January 10, 2003. (Id.) Next to Mr. Davis' name in Marge Mincer's handwriting is a notation of "1/7", indicating that Mr. Davis was given a booklet on January 7, 2003. (Id.; Graham Dep., at 60.)

Mr. Davis argues that the distribution procedure used by Defendants was not reasonably calculated to ensure actual receipt of the plan descriptions because the chosen method of placing copies of the material in a location frequented by participants is not acceptable under ERISA. (Plaintiff's Memorandum in Opposition, at 13-14, citing 29 C.F.R. § 2520.104(b).) We disagree Defendants' method of distribution was not to merely place copies of the material in a location frequented by participants.

Mr. Davis also argues more specifically that the Defendants' method of delivery for the 2002 summary plan description was deficient as a result of how Ms. Mincer actually distributed the benefits booklets. Ms. Mincer provided an Affidavit in which she stated as follows:

4. In January, 2003, I distributed the IBP 2 Booklet to some employees who were working in my department.

5. I recall that Richard Davis was not working in January 2003. I never mailed him an IBP 2 book, and I did not give Davis an IBP 2 book.

6. I kept a list of the names of employees in the department, . . . , and I initialed

15

the list when books were set aside or given to employees in January 2003. If an employee was not there, I would set aside a book for the individual and initial the list.

7. I believe that when I initialed the list with the date 1-7 by Davis' name, it would signify that I set aside a book for him.

(Affidavit of Marge Mincer, September 16, 2008, Pl. Ex. G.)

While Ms. Mincer's affidavit is supportive of Mr. Davis' contention that he never received a 2002 plan description, it is not sufficient evidence to show that the Defendants' method of distribution was deficient. Ms. Mincer's testimony shows that she failed to follow instructions as set forth in the letter to Department Heads.

The letter instructed that each employee on the enclosed list "is to be given a copy of the IBPII Benefit Booklets . . . ." (Def. Ex. 34 (emphasis added).) The letter also stated: "Please note on the listing that the employees have been given their copy of the booklet and return it to my attention in the Benefits Department by Friday January 10, 2003.) (Id. (emphasis added).) While Ms. Mincer admits that she did distribute the booklet to "some" employees, Ms. Mincer also admits that she failed to give Mr. Davis a booklet.

In addition, contrary to instructions to "note on the listing" when employees had been given a booklet, Ms, Mincer also made a note on the listing when employees had not been given a booklet. This additional note was indistinguishable from her notes that indicated that an employee had received a booklet. Ms. Mincer made a handwritten notation of a date next to *every* employee on the list, indicating one of the following dates: "1/7," "1/8," "1/9", "1/10." and "1/13." (Ex. A to Mincer Affidavit.) There is nothing to indicate that some of these employees were actually given a booklet, while other employees had a booklet set aside for them.

16

We cannot say this failing on Ms. Mincer's part demonstrates that Defendants' method of distribution was not reasonably calculated to ensure actual receipt. Had Ms. Mincer followed instructions and made an explicit indication that an employee had not been given the booklet, then the Benefits Office could have continued with their procedures by mailing a booklet to Mr. Davis or arranging some other method of delivery. (Cassidy Affidavit, at ¶ 4; Affidavit of Karen Fitzpatrick, June 1, 2002, ¶ 7.) For example, Ms. Fitzpatrick sent an identical distribution letter with attached employee listing to the Department Supervisor of AK Steel's North Processing department. (Def. Ex. 55-1[1].) The employee list here, like the Labor Department list, contains handwritten date notation indicating when an employee received a booklet, however the North Processing list also indicates that three people were "sick" and that a booklet was provided to them either by being "mailed," or "delivered." (Id.)

We therefore find that there is no genuine issue of material fact that Defendants' manner of distribution of the summary plan descriptions was reasonably calculated to ensure actual receipt of the material. 29 C.F.R. § 2520.104b-1(b)(1); Comcast, 2008 WL 696925, at *2. Accordingly, we find that Defendants complied with ERISA requirements for distribution of benefit information.

## B.    Notification of Need to Apply Before Break in Service

Mr. Davis also argues that even if Defendants complied with the regulations regarding distribution of summary plan descriptions, Defendants remain liable for failing to notify Mr. Davis that he must apply for long term disability benefits before his break in service. (Plaintiff's Memorandum in Opposition to Defendants' Motion, at 16.) Specifically, Mr.

---

[1] Plaintiff requests that Defendants' Exhibit 55 be stricken. (Plaintiff's Sur-Reply, at 1-2.) We find nothing inappropriate about this exhibit and therefore we deny this request

17

Davis claims that "the 2002 IBP II does not clearly state that the application for LTD must be made before service is broken." (Id., at 17.) He further claims that the requirement that a participant must apply for benefits before a break in continuous service was a new requirement. (Id.) We disagree.

The requirement that Long Term Disability benefits must be applied for prior to a break in continuous service has been an eligibility requirement since before Mr. Davis was hired in 1991. Thus, the requirement was not a new requirement during the relevant time of this lawsuit. Additionally, Defendants provided notification about this requirement for eligibility in each of the summary plan descriptions that was published and distributed in 1991, 1994, 1997, and 2002. The summary plan descriptions all referred to the same Long Term Disability plan (which was amended only once in 1994, by expanding eligibility to people over 62 years of age), and each summary plan description explained that participants "are eligible to apply for LTD benefits if . . . your continuous service has not been broken." As discussed in the previous section, each of these summary plan descriptions were distributed by means reasonably calculated to reach Mr. Davis.

Furthermore, when Mr. Davis's attorney inquired about Long Term Disability benefits in 1993, the Benefits Coordinator responded directly to Mr. Davis by letter stating in part as follows:

Per your request, please note answers to your two questions directed to the Benefits Office:

2. Attached is the language regarding the Long Term Disability Plan, which was taken from the Hourly Benefits Workbook. Please notice that I have highlighted the page that lists the conditions for eligibility (Page LT 2).

4. An Employee's Continuous Service will be broken by an absence which continues for more than two years.

18

(Letter from Patricia Cassidy to Richard Davis, July 12, 1993, attached as Ex. B to Def. Ex. 15.) Attached to the letter was a page of the 1990 benefits booklet that set forth the eligibility requirements, including the requirement that an applicant meets the condition that his "continuous service has not been broken . . . ." (1990 Benefits Workbook, Def. Ex. 12, at LT 2.)

Mr. Davis also claims that because he received Sickness and Accident benefits automatically, he was led to believe that he did not have to apply for long term disability benefits. However, an employee must apply for Sickness and Accident benefits. (Fitzpatrick Dep., at 44.) Moreover, both the summary plan description and the letter to Mr. Davis used the word "apply" in indicating how to receive Long Term Disability benefits, making it clear that the benefits were not automatic, but rather that employees must apply for them and that Mr. Davis was required to do so before his continuous service was broken.

In addition, the eligibility requirements set forth in the various documents produced and distributed by Defendants are "written in a manner calculated to be understood by the average plan participant, and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. 1022(a)(1). The average plan participant would understand that in order to obtain long term disability benefits one must meet the eligibility requirements and actually apply for the benefits. There are no implied additional terms in the eligibility requirements and the language is straightforward.

19

Finally, there is no evidence to support Mr. Davis' contention that Defendants acted in bad faith or actively concealed information from Mr. Davis. (Plaintiff's Memorandum in Opposition, at 19.

Mr. Davis was repeatedly provided with ample notification about the eligibility requirements instructing that participants must apply for Long Term Disability benefits before a break in continuous service. There is no genuine issue of material fact as to whether Defendants properly notified Mr. Davis that he was required to apply for benefits before his break in service.

## C.   Need to Apply Before Continuous Service Break

Mr. Davis also contends that there is a genuine issue of material fact as to whether he actually had to apply for benefits before his break in service. (Plaintiff's Memorandum in Opposition, at 11-12). He claims that a general issue of material fact remains as to whether he should be able to receive benefits automatically pursuant to Section 7.0 of the Benefits Plan, which provides that long term disability benefits "will be payable" if an employee becomes totally disabled and is under the care of a licensed physician." (Id. at 12.)

We are required to interpret benefits provisions according to the plain meaning of the plan. See Vitale v. Latrobe Area Hosp., 420 F.3d 278 (3d Cir. 2005) (ruling that benefits plans must be administered in accordance with the documents and instruments governing the plan). The eligibility requirements for long term disability state that employees must apply for benefits in order to receive them. As noted, by using the word "apply" in indicating how to receive Long Term Disability benefits, Defendants have made it clear that the benefits were not automatic. Reading the eligibility requirements together with Section 7.0's statement that

20

benefits "will be payable" leads to the commonsense conclusion that once an eligible person applies for benefits, the benefits "will be payable."

### D. Breach of Fiduciary Duty

Finally, Mr. Davis alleges that Defendants had a legal duty to disclose material information to him beyond what is required by ERISA. (Plaintiff's Memorandum in Opposition, at 20, citing Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255, 1264 (3d Cir. 1995).) Mr. Davis explains that AK Steel's Benefits Office kept track of all employees who had exhausted their Sickness & Accident benefits, along with information about each employee's status as to Social Security Disability Income benefits, the last date the employee worked, the employee's years of service, and the employee's break in service date. (Plaintiff's Memorandum in Opposition, at 22.) He further alleges that by 2003, AK Steel had all the information necessary to show that Mr. Davis met the eligibility requirements to apply for benefits. (Id.) Thus, he concludes that by Defendants not informing Mr. Davis that he was eligible to apply for benefits and assisting him in applying for benefits, Defendants breached their affirmative duty under the Plan. (Id.)

We disagree with Mr. Davis' contention that Defendants actually knew that Mr. Davis was "disabled" as defined under the Long Term Disability plan. Dr. Abbot, the physician who must certify that an applicant for benefits is "totally and permanently disabled", never found that Mr. Davis was disabled for purposes of long term disability benefits since Mr. Davis never applied for benefits. Being "disabled" for purposes of Sickness & Accident benefits or Social Security Disability Insurance does not necessarily mean that one is "disabled" for purposes of a long term disability program. Although Dr. Abbot agreed that at times Mr. Davis was temporarily disabled, she also released him to work in June 2002,

21

November 2002, December 2002, and October 2003. (Def. Ex. 56.)   Nonetheless, viewing

the facts in a light most favorable to Mr. Davis, we assume that Defendants knew that Mr.

Davis might be eligible for long term disability benefits, but this does not mean that

Defendants had a duty to seek out Mr. Davis to inform him that he may be eligible to apply

for long term disability benefits.

As noted, "a fiduciary may satisfy its statutory disclosure obligations regarding the

terms of a plan by distributing a summary plan description that complies with ERISA."

Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d at 1263.  However,

fiduciaries are not generally obligated to seek out participants to urge them to apply for

benefits, Id. at 1263-64, or to explain the terms of a written plan to beneficiaries.  Schiffer v.

Equitable Assurance Sec. of the U.S., 838 F.2d 78 (3d Cir. 1988).

Mr. Davis relies on Bixler v. Central Pa. Teamsters Health-Welfare Fund, 12 F.3d

1292 (3d Cir. 1993) to argue that Defendants breached their fiduciary duty by failing to

affirmatively advise and assist him in applying for benefits.   In Bixler, the wife of a plan

participant who was in the hospital received a COBRA notice about continuing coverage that

she believed her husband was not eligible for.  Id.  at 1302.   In fact, her husband was eligible

for the COBRA benefits.  Id.  After the husband passed away, but before the time period to

apply for the COBRA benefits had expired, the wife telephoned the defendant company to

inquire about death benefits.  Id.  The company accurately answered the death benefit

question.  Id.

However, the United States Court of Appeals for the Third Circuit believed there was

"evidence from which a trier of fact could infer that [the company representative] knew the

Bixlers and their situation well enough to be aware of Mr. Bixler's hospitalization and the

22

attendant medical expenses." Id. Specifically, the Court noted that it was possible that the company representative knew that the Bixlers had substantial medical expenses that could be reimbursed by signing and returning the COBRA notice. Id. The Court concluded that genuine issues of material fact existed regarding whether the company breached its fiduciary duty by failing "to advise her of the available benefits . . . despite the fact that her inquiry was limited to the availability of a death benefit. Id.

Mr. Davis argues that the circumstances here are similar in that Defendants knew enough about Mr. Davis' circumstances, including the possibility that he was "totally and permanently disabled," to know that he would most likely qualify for long term disability benefits. Thus, Mr. Davis argues that Defendants breached their fiduciary duty by failing to advise him to apply for benefits before his continuous service had broken. Mr. Davis also supports his argument by referring to Defendants' letter notifying him that his continuous service would be broken. (Letter from Rick Winter to Richard Davis, January 15, 2004, Pl. Ex. N.) In that letter, Defendants explained that Mr. Davis would "cease to have coverage for all active employee benefits contained within the Insurance Benefits Plan," but failed to specifically inform him that he had only a few days left to apply for long term disability benefits, a benefit Defendants knew that Mr. Davis was likely eligible to receive. (Letter from Rick Winter to Richard Davis, January 15, 2004, Pl. Ex. N.)

In response, Defendants cite to Joyce v. RJR Nabisco Holdings Corp., 126 F.3d 166 (3d Cir. 1997). In Joyce, the Court of Appeals set forth the applicable law as follows:

This Court has held that a fiduciary's obligations include the duty to provide complete and accurate information to participants and beneficiaries. This duty extends beyond just responding to requests about specific benefits; instead, if the fiduciary has reason to believe that a beneficiary is eligible for benefits that are not the precise subject of his or her request, the fiduciary may

23

violate its duties if it fails to provide information about those benefits. Jordan
v. Federal Express Corp., 116 F.3d 1005, 1016 (3d Cir.1997); Glaziers [and
Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities], 93
F.3d [1171,] 1182 [3d Cir. 1996)].

Joyce, 126 F.3d at 174. The Court pointed to the Bixler case as an example, explaining that
"if a beneficiary requests information about medical and death benefits, the fiduciary's failure
to inform her that she could purchase continuation coverage could constitute a breach of
fiduciary duties, even if she did not specifically ask for that information." Id., citing Bixler,
12 F.3d 1292. In addition, the Court further explained that "a fiduciary has not discharged its
obligations when an employee asks about a program for which the employee is not eligible,
and the fiduciary fails to give him information about a similar program for which he is
eligible." Id., citing Eddy v. Colonial Life Ins. Co., 919 F.2d 747 (D.C.Cir.1990).

In Joyce, the plaintiff was initially placed on short-term disability under the company's
benefit plan. Id. at 169. Eventually, his doctor noted that he was improving and cleared him
to return to work on March 1, 1989. Id. Joyce telephoned the company approximately ten
times in February 1989 to inquire about returning to work in a different position, and also to
ask about "'his rights and options under the circumstances.'" Id. at 169, 175. The company
informed Joyce that it did not have an appropriate alternative position, and as a result Joyce
resigned. Id. at 169-170. The company did not tell Joyce that he might be eligible for long
term disability benefits. Id. at 170.

In Joyce, the question was "whether Joyce has come forward with enough evidence to
withstand summary judgment on his claim that [the defendant company] violated its fiduciary
duties when it failed to provide him specific information about long-term disability benefits,
where the company had already provided him with a comprehensive benefits manual which

24

included extensive information about these benefits." Id. at 174. The Court of Appeals found that Joyce did not produce sufficient evidence from which a trier of fact could conclude that the defendant company knew that Joyce might be eligible for long term disability benefits. Id. at 175-176. The Court also found it "[e]qually important" that the company had "provided Joyce with a benefits manual explaining both long and short-term disability benefits," which Joyce had read. Id. at 175. The Court explained that "had Joyce requested information about long-term benefits, or made clearer that he was interested in his eligibility for them, then [his company] may have had an obligation to provide him with more information or a claims form." Id. Under the circumstances, the benefits department "had no special obligation to make sure that Joyce understood the manual's contents." Id.

From Joyce and Bixler we can discern three pertinent factors to consider when determining whether a defendant has a fiduciary duty to provide information: (1) whether the plaintiff inquires about benefits; (2) whether under the circumstances the defendant has a reason to know that the plaintiff might be eligible for certain benefits that plaintiff does not inquire about; and (3), "equally important" whether the plaintiff has already been given sufficient information from which the plaintiff could determine that he might be eligible for benefits, id. at 175.

Mr. Davis never inquired about benefits before his continuous service had broken. Mr. Davis alleges that Defendants breached their affirmative duty to inform by not assisting him in applying for long term disability benefits when he inquired about benefits "in this time frame", meaning 2003. (Plaintiff's Memorandum in Opposition, at 22.) However, Mr. Davis cites neither supporting facts nor evidence to show that he made an inquiry about long term disability benefits in 2003. According to his Complaint, he first inquired about long term

25

disability benefits in August 2007. (Compl., ¶ 19.)  According to his Statement of Facts, he

first recalled inquiring about benefits in December 2006.  (Plaintiff's Response to Defendants'

Statement of Uncontested Material Facts, ¶ 63.)  Each of these inquiries took place at a time

when Mr. Davis was ineligible for benefits because his continuous service had broken.

By the time he inquired about benefits, which was no earlier than December 2006, he

was not eligible to apply for long term disability benefits.  Since Mr. Davis never timely

made an inquiry about benefits to Defendants, it appears that Defendants' duty to inform Mr.

Davis about the possibility of applying for long term disability was never triggered.

Mr. Davis argues that under the circumstances here, Defendants did have the duty to

provide information about long term disability benefits to Mr. Davis because Defendants had

all the information necessary to show that Mr. Davis was likely eligible for benefits;

Defendants knew that Mr. Davis would soon lose this eligibility; and Defendants failed to

specifically provide this information in the letter informing Mr. Davis that his continuous

service would be broken.

Mr. Davis' argument requires us to examine whether a plaintiff must make an inquiry

before Defendants' duty to inform is triggered.  Our review of the Joyce and Bixler cases

appears to indicate that a prerequisite to triggering a defendant's duty to inform is that the

plaintiff first initiates a request for benefit information.  In setting forth the applicable law, the

Court of Appeals explicitly noted that the circumstances include the defendant responding to a

request from the plaintiff.  Joyce, at 174(duty to inform "extends beyond just responding to

*requests about specific benefits;*" . . . and the fiduciary may violate the duty by failing to

provide information that is "*not the precise subject of his or her request*" (emphasis added).

The plaintiffs in Joyce, Bixler, and Eddy all made a timely inquiry about benefits: Joyce asked

about "rights and options under the circumstances" and claimed that the defendant should have informed him about long term disability benefits before he resigned and lost his eligibility; Bixler asked about death benefits and claimed the defendant should have informed her about COBRA coverage before her right to apply expired; and Eddy asked about his soon to be terminated health insurance and claimed the defendant should have informed him about continuation and conversion procedures before his insurance terminated.

We cannot state with certainty that a plaintiff must make an inquiry in order to trigger the duty. However, it is clear that Defendants must have some reason to know of a plaintiff's circumstances to trigger the duty. An inquiry from a participant is typically the action that puts a fiduciary on notice about a particular beneficiary, but it is possible that in the absence of an inquiry a fiduciary may be aware of material information that it knows the beneficiary or participant does not know and needs to know for his protection. Under such circumstances it is likely that the fiduciary's duty to inform would be triggered. However, it is critical that the plaintiff show that Defendant in fact had notice of the plaintiff's particular circumstances before such a duty will be imposed. Mr. Davis is unable to show such notice in this case.

Had Mr. Bixler's wife not called the company to inquire about death benefits, the company's duty to inform her of COBRA benefits would not have been triggered. This is true even though, in the absence of an inquiry, the company presumably still had the necessary information regarding Mr. Bixler's hospitalization and medical expenses and thus it could have been "possible that the company representative knew that the Bixlers had substantial medical expenses that could be reimbursed by signing and returning the COBRA notice." Bixler, 12 F.3d at 1303. However, without Mrs. Bixler's inquiry about death benefits, the

27

company would have had no reason to focus its individualized attention on Mr. Bixler's circumstances.

Assuming that Defendants possessed the necessary information that showed that Mr. Davis was potentially eligible to apply for long term disability benefits, the question becomes whether Defendants were under a duty to inform Mr. Davis of this likelihood given that his continuous service was about to break. Under the circumstances of this case, we see no evidence to show that Defendants were prompted to focus their individualized attention on Mr. Davis' circumstances.

The fact that Mr. Davis' continuous service was about to break is not a sufficient trigger. Plaintiff does not argue that Defendants have a duty to review an employee's record in search of benefits the employee may be eligible for anytime that continuous service is about to break, and we decline to impose such a duty. It is sufficient that Mr. Davis was informed that when his continuous service breaks he "will cease to have coverage for all active employee benefits contained within the Insurance Benefits Plan." (Letter from Winter to Davis, January 15, 2004, Pl. Ex. N.)

Even if we assume that Defendants did have a reason to focus attention on Mr. Davis' particular circumstances, we then must proceed to the "equally important" question of whether Defendants would have reason to believe that the benefit information already provided to Mr. Davis was insufficient, or that Mr. Davis was otherwise unable to determine that he might be eligible for benefits. Joyce, 126 F.3d at 175. As detailed above, Defendants properly complied with ERISA and notified Mr. Davis that he was required to apply for benefits before his break in service, and thus Defendants were under no further obligation to ensure that Mr. Davis was aware of the eligibility requirements. Defendants provided Mr.

Davis with summary plan descriptions on several occasions. In addition, Mr. Davis was given a letter explaining his long term disability benefits in response to his attorney's request in 1993. Although Mr. Davis is unable to remember receiving these documents, Defendants' method of distribution was not deficient and Defendants would have no way of knowing that Mr. Davis was not completely and correctly notified and informed of the long term disability plan's eligibility requirements.

Accordingly, we find that Defendants fulfilled their fiduciary duty to provide complete and accurate information to Mr. Davis.

**V. Conclusion**

This Court finds that under a *de novo* standard of review, Mr. Davis was ineligible to apply for Long Term Disability benefits because he applied after his continuous service broke. Furthermore, we find that Defendants' claims procedures were in compliance with ERISA provisions, and that Defendants upheld their fiduciary obligations. Since no genuine issue of material fact remains on any of these issues, we grant summary judgment to Defendants.

An appropriate Order will be entered.

November 17, 2009
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.,
Senior District Judge

29